Burke & Thompson *vs.* Chaperon.

## No. 7337.

## No. 7277.

### Burke & Thompson vs. Philip Chaperon, Baptiste Laporte Third Opponent.

The principle that the creditor of a vendor cannot disregard a sale made by him, and that a seizure cannot be made of the property sold, until by a revocatory action he has annulled the sale, cannot be invoked when the sale is not real but a sham.

The alienation by a debtor of the whole of his property for an insufficient price is conclusive proof of fraud.

Minute carefulness to conceal fraud often betrays its presence.

Superfluous pains-taking efforts to create the verisimilitude of honest dealing are the devices of crafty schemers to conceal dishonesty.

Appeal from the Third District Court of New Orleans. Monroe, J.

*M'Caleb* and *Timony* for Plaintiffs. *Michinard* for Third Opponent Appellant.

Manning, C. J. Chaperon had become indebted to the plaintiffs in the sum of thirteen hundred and one dollars for goods sold and deliv-

ered on May 2, 1878, and shortly thereafter absconded. This suit is for the recovery of that sum, and is accompanied by the process of attachment with the usual sworn allegations, bonds, etc. His flight was sudden, this suit having been filed only three weeks after the date of the purchase. He kept a grocery on Decatur Street, the contents of which were seized under the attachment. When the sheriff made the seizure, the grocery was in the possession of Laporte who claimed its ownership. It appears that Chaperon and Laporte had gone before a notary on the 21st of May, and a formal sale of the contents of the grocery was made for sixteen hundred dollars, of which thirteen hundred dollars was paid cash, care being taken to count the money, and for the residue a cheque was given on the Citizens' Bank. The plaintiffs charge that this sale was simulated, and was only a device to screen his goods from seizure when his flight, which took place the next day, became known. Laporte avers that the sale was real. The contest is between them.

Laporte had not deposited any money in bank since August, 1877, until May 18th, following, when three hundred dollars were deposited. It was proved that this money was given to him by Chaperon in a retired room of the grocery, and under circumstances indicating that it was not in the usual course of business. The theory is that this was the first step in the preparation for the pretended sale, which was made three days afterwards, and that the whole sum which was to constitute the apparent price of the sale was not put in Laporte's possession, because Chaperon was afraid to carry his confidence in Laporte too far, lest the latter might be tempted to anticipate his friend in absconding, carrying off the loot, and thus the ill which was designed for the creditors would have returned to plague the inventor.

The outward forms of the sale having been gone through, Chaperon disappeared and Laporte remained. Other purchases of goods had been made from other firms by Chaperon, so that his stock had swelled to $3,500 or thereabouts, and these purchases, like that from plaintiffs, were made just before the flight. Laporte had not had time to change the sign, and the insignia of the new pretended ownership were not yet apparent.

The sheriff put keepers over the property, but notwithstanding their vigilance, or in consequence of their want of it, Laporte found opportunity to get away from the store a part of the goods. A

negro, Moses Jones, had been in Chaperon's employ, and was retained by Laporte, who saw that barrels of liquors were being hauled away, and gave the plaintiffs information. He pronounced the sudden change of ownership of the grocery a fraud with oracular conviction, and told the clerks " there was money in the thing," evidently meaning that he and they could make money by playing informer. There is a good deal of characteristic ornamentation in his testimony, and some lying, but we can see through these transparencies, and trace the main thread of truth in it from what has been said by others, and from the general facts and circumstances.

It is hardly necessary to add that we believe this sale to have been the veriest of shams. Chaperon had gathered together as large a stock of goods as possible by purchases from several houses, had provided Laporte with the money to give the sale before the notary the appearance of reality, and incontinently fled, under the belief that such people have, and which is entertained by some wiser than they, that this counting out the money and giving the bank check before the notary and the witnesses was an operation of such infinite gravity and such imposing solemnity, that all the world must be impressed by the belief that it meant honesty, reality, and straightforwardness. Laporte was to remain on the spot, and interpose his badge of ownership between the goods and the pursuing creditors, who would thus be baffled, and when quiet was restored, the proceeds of the sale of the goods which Laporte could make by retail at good profit would be shared by Chaperon.

Laporte's counsel admits Chaperon's roguery, but insists that his client is a victim of it as well as the plaintiffs, and shelters him behind the legal principle that the sale was a reality, and must be annulled by the revocatory action, and that creditors of the vendor cannot disregard it and seize.

There is not any doubt about the legal principle, but before you can claim its application, you must shew that the sale is real. The proof establishes the contrary indubitably. Besides, Chaperon sold everything. It was an alienation of all his property, and made as Laporte well knew for an insufficient price. A part of the price paid was Chaperon's own money, even if it is conceded that the cash counted out was really Laporte's. The $300 was handed by Chaperon to Laporte, deposited by the latter in the bank, and a cheque

then given by him to Chaperon for his own money. The contract is tainted by this fraudulent transaction, even assuming that Laporte paid the cash from his own funds, but we have no doubt the whole of the money was Chaperon's, and that the entire transaction was a fraud, and an ill-contrived fraud. Spurlock *v.* Mainer, 1 Annual, 301.

*Judgment affirmed.*